Argued and submitted December 8, 1981, affirmed February 10, 1982

In the Matter of Sonja Charloe, a child.

## STATE ex rel JUVENILE DEPARTMENT, MULTNOMAH COUNTY,

*Respondent on Review,*

*v.*

## ENGLAND,

*Petitioner on Review.*

(SC 27983,   CA 18918)

640 P2d 608

Craig J. Dorsay, Portland, argued the cause and filed the brief for petitioner. With him on the brief was Kent B. Thurber.

Richard David Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, John R. McCulloch, Jr., Solicitor General, and William F. Gary, Deputy Solicitor General, Salem.

CAMPBELL, J.

Tanzer, J., concurred and filed an opinion.

Tongue, J., dissented and filed an opinion.

## CAMPBELL, J.

The issue in this case is whether an Indian foster parent has "legal custody" of an Indian foster child so as to come within the definition of "Indian custodian" under the federal Indian Child Welfare Act (hereinafter ICWA), 25 USC § 1901 et seq. Persons qualifying as "Indian custodians" under the ICWA are entitled to notice and certain other rights in proceedings to terminate placement. 25 USC § 1912. The Multnomah County Circuit Court Juvenile Department denied petitioner England's motion for reconsideration of its order revoking her status as foster parent of her niece, Sonja Charloe. The Court of Appeals affirmed, 52 Or App 843, 629 P2d 1319 (1981), finding that petitioner was not an "Indian custodian" as defined by 25 USC § 1903(6):

"Indian custodian means any Indian person who has legal custody of an Indian child under tribal law or custom or under state law, or to whom temporary physical care, custody, and control has been transferred by the parent of such child;"

We allowed petitioner's petition for review.[1]

Sonja Charloe was born November 4, 1970. Her mother, Eileen Charloe, was the daughter of a Seneca and Cayuga Indian father and a Scotch-Irish mother. Both Eileen Charloe and Sonja Charloe are enrolled members of the Seneca-Cayuga Indian Tribe of Oklahoma. Since 1970, Sonja's life has been divided between living with her mother and living with her mother's full sister and family (petitioner) or in an institution. Children's Services Division (hereinafter CSD) has been asked to intervene in the care of Sonja at least ten times since 1970, half of these by the mother, with or without police intervention, and half by petitioner. Sonja has been committed to the legal custody of CSD and made a ward of the court four times, the last of these on February 13, 1979. At the time of the hearing at issue CSD had legal custody of Sonja, and had placed her in the foster care of her aunt, petitioner. At the hearing, held January 15, 1980, it was determined that foster care with

---

[1] Petitioner does not claim status as an "Indian custodian" under tribal law or custom or by transfer from the parent. Therefore only the state law question is before us.

petitioner should be terminated. The natural mother received notice of the hearing pursuant to 25 USC § 1912:

"(a)   In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided,* That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding."

This provision also applies to removal from foster care. 25 USC § 1916.

Petitioner did not receive notice under 25 USC § 1912, nor did she receive actual notice of the hearing. On June 9, 1980, petitioner filed a motion to invalidate the January 15, 1980 hearing and to hold a new hearing pursuant to 25 USC § 1914. A hearing was held on the motion on August 20, 1980, at which point the circuit court denied petitioner status as an "Indian custodian" and issued an order denying the motion for reconsideration:

"This matter came before the court on the motion of the maternal aunt and uncle, Mr. and Mrs. England, for a reconsideration of the wardship order and disposition of January 15, 1980. The Court listened to the arguments of respective counsel for each of the parties, including counsel for Mr. and Mrs. England, and makes the following finding of law: Mr. and Mrs. England are not Indian custodians within the definition of 25 USC § 1903(6) for the reason that they do not have legal custody of the child under the law of the State of Oregon. Based on this finding, the motion for reconsideration is not well taken and is hereby disallowed."

Petitioner filed a notice of appeal from the order denying the motion regarding the court's original order

revoking the Englands' status as foster parents of Sonja Charloe. Petitioner alleges error in the Court of Appeals finding that, because legal custody of Sonja was in CSD pursuant to ORS 419.507(2),[2] petitioner did not fit the statutory definition of "Indian custodian" in 25 USC § 1903(6). Petitioner contends that: 1) the term "Indian custodian" should be interpreted in a way consistent with the purposes of the ICWA, which would suggest an interpretation of "legal custody" to include actual lawful physical custody for purposes of status as an Indian custodian; and 2) Federal standards in the ICWA preempt state law defining legal custody. The state counters by arguing that "legal custody" means "legal custody" and that this was in CSD, and that preemption does not apply since the federal statute refers to state law for a definition of "legal custody," therefore there is no conflict to be resolved by resort to the doctrine of preemption.

---

[2] ORS 419.507 provides:

"A child found to be within the jurisdiction of the court as provided in subsection (1) of ORS 419.476, may be made a ward of the court. Where a child has been found to be within its jurisdiction, and when the court determines it would be in the best interest and welfare of the child, the court may:

"(1) Place the child on probation or under protective supervision. The court may direct that the child remain in the legal custody of his parents or other person with whom he is living or may direct that the child be placed in the legal custody of some relative or some person maintaining a foster home approved by the court, or in a child care center or a youth care center authorized to accept the child. The court may specify particular requirements to be observed during the probation or protective supervision consistent with recognized juvenile court practice, including but not limited to restrictions on visitation by the child's parents, restrictions on the child's associates, occupation and activities, restrictions on the requirements to be observed by the person having the child's legal custody and requirements for visitation by and consultation with a juvenile counselor or other suitable counselor. Restitution for property taken, damaged or destroyed by the child may be required as a condition of probation.

"(2) Place the child in the legal custody of the Children's Services Division for care, placement and supervision.

"(a) The division may place the child in a child care center authorized to accept the child.

"(b) If the child has been placed in the custody of the Children's Services Division, the court shall make no commitment directly to any residential facility, but shall cause the child to be delivered into the custody of the Children's Services Division at the time and place fixed by rules of the division. * * *"

The primary controversy in this case revolves around interpretation of the term "legal custody" as used in the definition of "Indian custodian," 25 USC § 1903(6). We first look to the express language of this section, and then refer to the legislative history surrounding passage of the ICWA for elaboration. "Indian custodian" is defined by 25 USC § 1903(6) as:

> ".. . any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child;"

The literal language of this section indicates a clear intent that "legal custody" be used in its legal sense, i.e., as defined by state law or by tribal custom or law. Where the parent transfers temporary physical care, physical custody, and physical control to any other Indian person, such other person is to be considered an Indian custodian as well.

The context lends support to a literal reading of 25 USC § 1903(6). Other definitions in 25 USC § 1903 include the following:

> "(1)(i) 'foster care placement' (which) shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;. . .
>
> "(7) 'Indian organization' means any group, association, partnership, corporation, or other legal entity owned or controlled by Indians, or a majority of whose members are Indians. . .
>
> "(9) 'parent' means any biological parent or parents of an Indian child or any Indian person who has lawfully adopted an Indian child, including adoptions under trial law or custom. It does not include the unwed father where paternity has not been acknowledged or established; . . . "
> (Parenthesis added).

The definitions quoted above illustrate the variety of terms deliberately used in the ICWA. It is unlikely that Congress, while taking care to distinguish meanings by the use

of certain terms in its definition sections, would inadvertantly use a term of art such as "legal custody" to mean actual custody.

The ICWA was enacted in 1978 to effectuate the dual policies of protection of the best interests of Indian children and promotion of the stability and security of Indian tribes and families. 25 USC § 1902. Congress found that because of the special relationship between the federal government and Indian tribes, and because of Congress' plenary power over Indian affairs (United States Constitution, Art. I § 8, cl 3), federal action was necessary to avoid the alarmingly high percentage of Indian family breakups resulting from the removal of Indian children from their homes by nontribal public and private agencies and their placement in non-Indian foster and adoptive homes and institutions. Congress also found that administrative and judicial bodies have often failed to recognize the essential tribal relations of Indian people and their cultural and social standards. 25 USC § 1901. The ICWA therefore aims to promote its stated policies by "the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 USC § 1902. Among such minimum federal standards are the requirements of notice to parents and Indian custodians of any hearing regarding change in foster care placement or any termination of parental rights, 25 USC § 1912; the affording such persons other rights such as the right to intervene and the right to appointed counsel, 25 USC § 1911; § 1912; and the requirement that preference be given in adoptive or foster placement to members of the Indian child's extended family and members of the child's tribe, 25 USC § 1915.

Several things appear upon an examination of the ICWA itself. First, a distinction is drawn between those standing in the shoes of parents, whether by adoption or Indian custodian status or by blood, and foster parents or state agencies. Foster care is temporary in nature. It does not deprive the parent of his ultimate right to the child. *See* 25 USC § 1903(1)(i). Those having some form of permanent

custodial responsibility for an Indian child, or those receiving custody from a parent, are given the benefit of certain minimum protections before they are deprived of an Indian child, even for temporary foster care. Such custodians also have the right to invoke the ICWA's protections regarding preferences to be given to Indian families in foster and adoptive care. Second, foster parents are given no express rights under the ICWA. Third, Congress expressly intended to use the term "legal custody" as a term of art, as is illustrated by its use of "lawful" and "legal" elsewhere in the ICWA, giving rise to the inference of different meanings.

The legislative history does not contradict our reading of the ICWA. As originally proposed, the definition of "Indian custodian" included only those extended family members having temporary physical custody given by a parent or those having custody in accordance with tribal law or custom. S 1214, 95th Cong., 1st Sess. (1977). The final act broadened coverage to include "any Indian person," not merely extended family members to whom legal custody is given by state law or by tribal custom or law. Petitioner argues that the changes in drafting show the legislative intent to broaden the definition of Indian custodian. We agree, but we do not find this broadening intent to encompass petitioner's claim regarding related foster parents. All Indian persons coming within the definition of "Indian custodian" are allowed such status regardless of their status as relatives. This intent does not relate to the situation where an Indian extended family member does not come within the definition of "Indian custodian."

Petitioner quotes the following passage from the legislative history in support of its contention that "legal custody" means *actual physical custody* rather than legal custody as defined by state law:

> "Paragraph (6) defines 'Indian custodian.' Where the custody of an Indian child is lodged with someone other than the parents under formal custom or law of the tribe or under State law, no problem arises. But, because of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such

extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such a custodian may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect, including the right to protect the parental interests of the parents." H.R. Rep. No. 1386 at 20 (1978).

This section describes the reasoning behind allowing Indian custodian status to some persons other than those accorded legal custody under state law or under formal tribal law or custom. The ICWA expressly allows for "Indian custodian" status to Indian persons given physical custody by a parent. This informal custom would not yield such status unless expressly so provided by the ICWA. Petitioner does not claim Indian custodian status pursuant to the ICWA's provision regarding informal transfers from a parent. Since petitioner did not receive Sonja from a parent, she cannot qualify under that provision.

■ ■ As a general matter, foster parents who are paid for their temporary provision of room and board to children of others have no statutory rights on termination of their status. In Oregon, legal custody is in CSD where public funds are to be expended for foster care. CSD "purchases care" for foster children and supervises such care until adoption or majority. ORS 418.280; 418.480; 419.507(2). Indian foster parents are not included in the definition of "Indian custodian." We cannot say such persons are included in direct contradiction of the language of the Act. It is therefore unnecessary to invoke the constructional rules appellant argues for, since the legislative intent is clear on the face of the statute. A paid caretaker has very different concerns as to a child's welfare than does a family member who takes on the costs of care himself. We cannot say that the case is different where the paid caretaker also is a member of the child's extended family. Such a determination is up to Congress to make. We therefore hold that a member of a child's extended family who assumes foster care of such child and accepts state funds for such purpose does not become an "Indian custodian" and is therefore not entitled to notice of a hearing to terminate its parental status any more than a normal foster parent would be.

■    Petitioner's preemption argument is unpersuasive to us because Congress expressly left the determination of "legal custody" up to state law. Even if the federal legislation totally preempted the field, such an express intent would allow state law to govern the determination of legal custody. Since preemption was not clearly intended by Congress, we cannot now read such intent into the legislation. *Florida Avocado Growers v. Paul,* 373 US 132, 83 S Ct 1210, 10 L Ed 2d 248 (1963).

Affirmed.

**TANZER, J.,** concurring.

I concur in the result. I do not disagree with the majority, but I believe that a threshold issue is dispositive. I would hold that the notice provisions of 25 USC § 1912 have been complied with. The statute is phrased in the alternative: The moving party "shall notify the parent *or* Indian custodian and the Indian child's tribe." (Emphasis supplied.) Because the parent had actual notice, there was no need to notify the Indian custodian. The statute was fully complied with by notice to the parent.[1]

**TONGUE, J.,** dissenting.

The majority holds that a member of an Indian child's extended family, such as petitioner, who becomes the foster parent of such a child through the operation of state law, does not qualify under the Indian Child Welfare Act of 1978, 25 USC §§ 1901-1963, as an "Indian custodian" so as to be entitled to the procedural protections provided by the ICWA for "Indian custodians" in cases in which the

---

[1] At oral argument before this court, the state declined to urge this construction of the statute because, it contended, we should not impute to Congress an intention to violate the constitutional rights of foster parents. That contention is erroneous. First, the unambiguous words of the statute leave no room for judicial construction. If the statute is constitutionally deficient, that determination can be made in a proper proceeding which challenges the validity of the statute or asserts a constitutional claim. In this proceeding, petitioner seeks enforcement of her rights under the statute; she makes no constitutional claim. Second, whatever due process rights a legally established foster parent of less than 18 months may have, those rights do not include notice of and participation in judicial proceedings. *See Smith v. Organization of Foster Families,* 431 US 816, 97 S Ct 2094, 5 L Ed 2d 14 (1977).

placement of an Indian child is at issue.[1] "Indian custodian" is defined by 25 USC § 1903(6) as follows:

" 'Indian custodian' means *any* Indian person who has *legal custody* of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, and control has been transferred by the parent of such child; \* \* \*." (Emphasis added)

The majority concludes that Congress intended to use the phrase *"legal custody"* in its "legal sense"; therefore, the majority reasons, because CSD had *legal custody* of the child, petitioner could not have had such custody and, therefore, could not qualify as an "Indian custodian." Because I do not believe that such a conclusion is compelled by the language of the ICWA and because, in my opinion, such a conclusion leads to results which are contrary to the stated purposes of the ICWA, I respectfully dissent.

The Indian Child Welfare Act of 1978 was enacted based upon certain findings by Congress. Among those are the following:

"\* \* \* \* \*

"(3) that there is no resource that is more vital to the continued existence and integrity of Indian tribes than

---

[1] 25 USC § 1912(a) and (b) provide as follows:

"(a) In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child *shall notify the parent or Indian custodian* and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or *Indian custodian* and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or *Indian custodian* and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or *Indian custodian* and the tribe or the Secretary: *Provided,* That the parent or *Indian custodian* or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.

"(b) In any case in which the court determines indigency, the parent or *Indian custodian shall have the right to court-appointed counsel in any removal, placement, or termination proceeding.* The court may, in its discretion, appoint counsel for the child upon a finding that such appointment is in the best interest of the child. Where State law makes no provision for appointment of counsel in such proceedings, the court shall promptly notify the Secretary upon appointment of counsel, and the Secretary, upon certification of the presiding judge, shall pay reasonable fees and expenses out of funds which may be appropriated pursuant to section 13 of this title." (Emphasis added)

their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe;

"(4)   that an alarmingly high percentage of Indian families are broken up by the *removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes* and institutions; and

"(5)   that the *States,* exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, *have often failed to recognize the essential tribal relations* of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 USC § 1901(3), (4), (5). (Emphasis added)

Furthermore, the ICWA contains the following declaration:

"* * * it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families *by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture,* and by providing for assistance to Indian tribes in the operation of child and family service programs." 25 USC § 1902. (Emphasis added)

Petitioner contends that Congress intended the term "legal custody" to be interpreted in a manner consistent with the stated purposes of the ICWA and that, consequently, a proper interpretation of the term includes *any* Indian who has *actual lawful custody* of an Indian child, however determined.[2] Petitioner further contends that the federal standards established by the ICWA preempt state laws defining "legal custody." In support of her construction of the term "legal custody," petitioner sets out five

---

[2] Although there are facts below which would support petitioner's claim to "Indian custodian" status under the second part of 25 USC § 1903(6), "* * * [one] to whom temporary physical care, custody, and control has been transferred by the parent of such child," petitioner's argument on appeal is focused upon her being in "legal custody" of the child.

"rules of judicial construction" which, she asserts, apply here. Of these, the principle that "statutes passed for the benefit of Indians are to be construed in favor of Indians," citing *Bryan v. Itasca County*, 426 US 373, 392, 96 S Ct 2102, 48 LEd 2d 710 (1976), seems particularly appropriate in this case because the remedial character of the ICWA is not in dispute.[3]

The state contends that the ICWA requires an "Indian custodian" (other than one who obtained physical control from the parent) to have "legal custody" and that in this case "legal custody" was in CSD.[4] In response to the preemption argument, the state asserts that because the federal statute refers to state law for a definition of "legal custody" and there is no federal definition of "legal custody," there is no conflict to be resolved by resort to preemption.

---

[3] Petitioner further contends that because of the Congressional intent to promote the stability of Indian families, Congress did not intend to limit the class of "Indian custodians" only to those satisfying the state definition of "legal custody." She points to a portion of the House committee report which refers to 25 USC § 1903(6), the definition of "Indian custodian":

> " 'Paragraph (6) defines "Indian custodian." Where the custody of an Indian child is *lodged* with someone other than the parents under formal custom or law of the tribe or under State law, no problem arises. But, because of the extended family concept in the Indian community, parents often transfer physical custody of the Indian child to such extended family member on an informal basis, often for extended periods of time and at great distances from the parents. While such a custodian may not have rights under State law, they do have rights under Indian custom which this bill seeks to protect, including the right to protect the parental interests of the parents.' " H.R. Rep. No. 1386, 95th Cong., 2d Sess. 20 (1978), *reprinted in* 1978, U.S. Code Cong. & Ad. News 7530, 7543. (Emphasis added)

[4] In its Response to the Petition for Review, the state argues that:

> "An examination of the other portions of 25 USCA § 1903 shows that Congress understood the distinction between legal custody and other custodial or caretaking, relationships, and that it used the term 'legal custody' in its technical sense."

and that because:

> "Both the original bill and the final Act distinguished between 'legal custody' and mere 'custody' or 'temporary physical care, custody, and control.' Under fundamental principles of statutory construction this Court must presume that Congress had a purpose in mind for all of the language it used. * * * *The most logical interpretation of the statute is that, in using the term 'legal custody,' Congress intended to denote a particular legal relationship not sufficiently defined by the term 'custody.'* " (Emphasis added)

The Court of Appeals agreed with the state, holding that:

"Petitioner's argument that Congress intended a broad class of 'Indian custodians' and did not intend to refer only to persons who have legal custody as defined by state law reaches too far. Congress expressly provided that an 'Indian custodian' may be an Indian person to whom a parent temporarily transfers the care or physical custody of the child, thereby recognizing transfers to extended family members. While an informal transfer of care or physical custody gives rise to the procedural rights provided in the ICWA, where there is a formal, statutory foster placement, as here, involving CSD as legal custodian, a foster parent, not having *legal custody,* is not, by the terms of the statute, afforded the procedural safeguards of the ICWA." 52 Or App at 850-51. (Emphasis added)

The majority opinion, although purporting to analyze the language of the ICWA in order to find Congressional intent in using the term "legal custody," in essence, follows the same path as used by the Court of Appeals in reaching the result here. The majority states that:

"The *literal language* of this section [25 USC § 1903(6)] indicates a clear intent that 'legal custody' be used in its legal sense, i.e., as defined by state law or by tribal custom or law." 292 Or at 550. (Emphasis added)

The premise of the argument becomes its conclusion. The question here is whether "legal custody" was intended in its "legal sense." The majority answers the question by concluding, in effect, that the question does not exist. I am not convinced by the majority's reasoning that Congress intended the term "legal custody" to be limited to mean the result of a state determination of *status* rather than a *functional* custody *lawfully* achieved through the operation of tribal or state legal processes. The ICWA on its face does not disclose an unequivocal choice for either position.

The definition of "legal custody" adopted by the majority means that in the future where, as here, CSD has "legal custody" of an Indian child and foster placement results in that child's living with members of her extended family, those family members will not qualify as "Indian custodians." This situation, given the remedial character of the statute, is indeed ironic; i.e., although the policy of the

ICWA is served by allowing "Indian custodians" to intervene in child placement proceedings to insure placement in "foster * * * homes which will reflect the unique values of Indian culture * * *," 25 USC § 1902, the Indian member of the child's extended family who becomes custodian because of such placement[5] will *not* be able to intervene in any future decision to transfer placement, even though that proposed placement would be inconsistent with the express policy of the ICWA.[6] Petitioner's interpretation of the term "legal custody" is more consistent with the elimination of evils Congress sought to remedy, because both Congressional findings and petitioner's interpretation focus on the *conditions* of *actual* custody rather than the abstract legal *status* of the Indian child.

---

[5] 25 USC § 1915(b) provides as follows:

"Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

"(i)  *a member of the Indian child's extended family;*

"(ii) a foster home licensed, approved, or specified by the Indian child's tribe;

"(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

"(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."

[6] Whether foster parents *generally* have procedural rights under *Oregon law,* as discussed by the majority is not determinative of the question whether *this petitioner* has such rights under *federal law.* As stated in the following passage from the legislative history of the ICWA:

"In *Dice v. Akron, C.Y.Y. R.R. Co.,* 342 U.S. 359 (1952), the Court held:

" 'Congress * * * granted petitioner a right * * *. State laws are not controlling in determining what the incidents of this Federal right shall be.'

"Chief Justice Holmes, in *Davis v. Wechsler,* 263 U.S. 22 (1923), put it succinctly:

" 'Whatever springes the State may set for those who are endeavoring to assert rights that the State confers, the assertion of Federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice.'

It is possible that Congress did not intend for a person in the position of petitioner in this case to qualify as an "Indian custodian"; however, I am not convinced by the majority opinion that this is so. Because of the consequences of any decision in this matter, it is my opinion that this court should be more certain of its conclusions. As petitioner points out:

"The Indian Child Welfare Act is the result of a ten year Congressional investigation which found proof of serious problems in the handling of Indian child custody matters by non-Indian state and public agencies. The research disclosed that 25-35% of all Indian children are separated from their families and placed in foster or adoptive homes or institutions, and that 85% of all Indian children in foster care were living in non-Indian homes. House Report, *supra,* at 9. The evidence showed that in Oregon that 8.2 times as many Indian children as non-Indian children were in foster care relative to their percentage of the population; in Multnomah County the figure was 6.3 times as many. AMERICAN INDIAN POLICY REVIEW COMM'N, TASK FORCE FOUR: FEDERAL, STATE, AND TRIBAL JURISDICTION 224-30, 94th Cong., 1st Sess. (1976)."

"*Since approximately 95% of all foster care placements in Oregon are made with the state retaining 'legal custody' of the child, exclusion of foster parents from coverage under the ICWA will exclude Indian extended family members who become foster parents from the protections of the Act.* DEPT. OF HEALTH, EDUC. & WELF., OFFICE OF CIVIL RIGHTS, THE 1980 CHILDREN AND YOUTH REFERRAL SURVEY: PUBLIC WELFARE AND SOCIAL SERVICES (1980)."[7] (Emphasis added)

---

"We will quote merely two other cases to support the proposition that Congress may, constitutionally, impose certain procedural burdens upon State courts in order to protect the substantive rights of Indian children, Indian parents, and Indian tribes in State court proceedings for child custody [citing *American Railway Express Co. v. Levee,* 263 US 19, 44 S Ct 11, 68 LEd 140 (1923), and *Second Employer's Liability Cases,* 223 US 1, 32 S Ct 169, 56 LEd 327 (1912)]." H.R. Rep. No. 1386, 95th Cong., 2d Sess. 18 (1978), *reprinted in* 1978 U.S. Code Cong. & Ad. News, 7530, 7540-41.

[7] Upholding petitioner's claim to "Indian custodian" status would not bar CSD from making foster care placements, but would have the effect of allowing those in petitioner's position certain *procedural* protections when such placements are made. Such a result would be consistent with the requirements of 25 USC § 1915(b)(i), cited in note 5, *supra.*

With these considerations in mind and because the majority opinion adopts a definition of "legal custody" which reaches a result inconsistent with the remedial purposes of the Indian Child Welfare Act, I respectfully dissent.